**John CHO d/b/a Ace Construction & Interior Design, Appellant–Plaintiff,**

v.

**PURDUE RESEARCH FOUNDATION, Appellee–Defendant.**

No. 79A02–0305–CV–449.

Court of Appeals of Indiana.

Feb. 26, 2004.

---

Keith Fafarman, Gambs, Mucker & Bauman, Lafayette, IN, Attorney for Appellant.

John M. Stuckey, Stuart & Branigin, LLP, Indianapolis, IN, Attorney for Appellee.

**OPINION**

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Plaintiff, John Cho (Cho) d/b/a Ace Construction & Interior Design (Ace Construction), appeals the trial court's summary judgment in favor of Appellee–Defendant, Purdue Research Foundation (PRF).

We affirm.

### ISSUES

Cho raises eight issues on appeal, which we consolidate and restate as follows:

(1) Whether the trial court erred in determining that Ace Construction's mechanic's lien was invalid because PRF did not actively consent to the construction project;

(2) Whether the trial court erred in determining as a matter of law that the work performed by ACE Construction does not support a mechanic's lien;

(3) Whether the trial court erred in determining as a matter of law that Ace Construction's mechanic's lien was not filed in a timely manner and is invalid; and

(4) Whether the trial court erred in determining as a matter of law that Ace Construction was not entitled to file a mechanic's lien for the expenses incurred in constructing the clean room.

### FACTS AND PROCEDURAL HISTORY

On or about January 6, 2002, PRF[1] and Optolynx, Inc. (Optolynx)[2] entered into a Lease Agreement in which Optolynx leased from PRF 933 square feet in Unit D1–100 Rooms D1–103, D1–104, D1–105, D1–106, and D1–107 in the Purdue Technology Center (Technology Center) located at 3000 Kent Avenue, in West Lafayette, Indiana, in the Purdue Research Park (the "Leased Property"). Article 11 of the Lease Agreement expressly provided that Optolynx was not to make "alterations, changes, improvements or additions to the Leased Property without the prior written consent" of PRF. (Appellant's App. p. 223).

After executing the Lease Agreement, Optolynx expressed an interest in leasing separate, additional space amounting to eight thousand eight hundred eighty three square feet in units E1–100 and E1–200 ("additional space") of the Technology Center for the purpose of constructing a clean room for the manufacture of computer chips. It is undisputed that PRF was aware that Optolynx was developing plans for the construction of a clean room in the additional space. It is further undisputed that PRF did not participate in the following: 1) Optolynx's decision to pursue the construction of a clean room; 2) Optolynx's determination of the work that would be required in order to construct a satisfactory clean room; 3) Optolynx's selection of a contractor to perform the work; or 4) Optolynx's negotiation of an agreement with any prospective contractors. Greg Deason (Deason), the Director of Research

1. PRF is an Indiana corporation located in West Lafayette, Indiana, and the sole and exclusive holder of fee simple title to the Purdue Technology Center. PRF leased space in that facility to Optolynx, Inc. and others. None of PRF's tenants in the Purdue Technology Center have an ownership interest in the property.

2. Optolynx is an Indiana corporation and a former tenant in the Purdue Technology Center.

Park Development at PRF,[3] advised Optolynx that PRF would agree to the construction of a clean room in the additional space provided that PRF and Optolynx were both able to reach an agreement on the terms of a lease for the space.

On April 11, 2000, Cho d/b/a Ace Construction entered into a contract with Optolynx to construct the clean room in a portion of the Technology Center.[4] Ace Construction specializes in the construction of clean rooms and generally constructs four to five clean rooms per year. A clean room construction project involves four phases: 1) design; 2) purchasing; 3) manufacturing; and 4) construction. Under the terms of the contract between Ace Construction and Optolynx, Ace Construction was to provide the design engineering, materials, and installation of the clean room for a price of $810,000 subject to adjustments for changes in the scope of work or in equipment specifications. Some of Ace Construction's obligations under the contract were to be provided by Ace Construction's sub-contractors. Particularly, the services provided by Ace Construction are described on page 10 of the contract, as follows:

PROJECT MANAGEMENT

Trained Ace Construction personnel will professionally manage the OPTOLYNX, INC. project. Ace Construction will procure required subcontracting services, and an experienced technical crew will perform the turnkey installation.

(Appellant's App. p. 242).

At the time the contract was executed, Optolynx paid Ace Construction $81,000.00 as payment towards the contract price. However, Ace Construction has not received any other amounts paid by Optolynx or any other individual or entity towards the contract price. PRF did not participate in negotiating or drafting the contract agreement between Optolynx and Ace Construction, and further did not sign or initial the contract agreement. In fact, PRF was not provided with a copy of the agreement or the details of the agreement between Ace Construction and Optolynx until after Ace Construction recorded its Notice of Intention to Hold Lien on September 18, 2000.

Nonetheless, Deason informed Optolynx on numerous occasions that it was not authorized to begin construction of the clean room until PRF, as the landlord, had sufficient opportunity to review the plans for the proposed clean room and assess the potential impact the plans had on the other tenants and the Technology Center as a whole. Further, Deason informed Optolynx that PRF would not approve plans for the construction of a clean room in the Technology Center unless and until Optolynx executed a lease for the space in which the proposed clean room was to be constructed. Deason also informed Ace Construction that before any construction activities could go forward, PRF's approval would be required.

On May 16, 2000, Ace Construction presented to Deason a written request allowing them to remove some ceiling tile and

---

**3.** Deason's responsibilities at PRF included development of PRF's real estate and lease issues with tenants, including tenant improvements.

**4.** Ace Construction has been engaged in commercial and residential construction since 1992. Although Ace Construction is not incorporated, Cho's title is President. In April of 2000, Ace Construction had about seven employees, namely: Cho, President and Project Manager; James Seo (Seo), Chip Engineer; Tony Cho, Manufacturing Manager; Brad Cho, Office Manager; Samuel Cho, Clean Room Specialist; Chong Kim, Clean Room Specialist; and Joshua Kim, Purchasing Manager.

grid and to erect metal studs for partition walls inside the proposed clean room space. Although Ace Construction requested that PRF approve both the demolition of the existing ceiling and the installation of a metal frame, PRF approved only the minor demolition requested by Ace Construction. Thus, PRF denied authorization of the other construction activities in the additional space. PRF authorized Ace Construction to conduct the ceiling demolition because of its "optimism" and belief that the clean room would eventually be built. (Appellant's App. p. 626). The ceiling demolition work involved removal of the existing air conditioning ductwork, light fixtures, and wiring. Ace Construction did not hire a subcontractor to do the ceiling demolition; instead, they performed the work themselves. On or about May 18, 2000, the demolition work was completed.

After the demolition was completed, Ace construction requested that PRF approve the plans for construction of the clean room, sign the required local building permit applications, and execute additional documents so that the plans for the clean room could be submitted to the State of Indiana to secure a design release. On July 18, 2000, the design plans were reviewed in a meeting attended by representatives of Ace Construction, Optolynx, and PRF. During the meeting, Deason communicated the technical concerns identified during the design review to Ace Construction. Again, Deason informed Ace Construction that he had to be made aware of all improvements that would be made in the facility.

PRF reviewed the plans submitted by Ace Construction with the intent that Ace Construction would proceed with building the clean room. Nevertheless, Deason declined to execute any construction related documents at the meeting and did not approve the plans for the proposed clean room. Deason declined to execute any construction related documents because Optolynx had not executed a lease with PRF for the additional space where the clean room would be built. Eventually, negotiations between PRF and Optolynx proved unsuccessful and no lease agreement for the additional space for the clean room was ever executed or agreed upon.

Consequently, on September 7, 2000, Optolynx notified Ace Construction that Optolynx was terminating the contract agreement to build the clean room. Following the execution of the contract agreement and prior to its receipt of the termination notice, Ace Construction expended a total of $371,543.75 for the work, labor performed and the materials supplied and used on the real estate owned by PRF. Upon receipt of Optolynx's termination notice, Ace Construction did not perform any further design engineering for the clean room, purchase and/or start manufacture or acquisition of additional materials, parts, or equipment, or engage in any further demolition or construction of the clean room. However, Ace Construction was required to provide the following services pursuant the contract agreement and its termination by Optolynx: 1) receive and warehouse the materials purchased for use in the clean room; 2) return materials purchased for use in the clean room, which were returnable; 3) complete the manufacture of materials, parts, or equipment previously started; and 4) attempt to sell or otherwise use special order materials purchased for use in the clean room, which were not returnable. Ace Construction incurred an additional expense of $11,942 in labor to complete these tasks.

On September 18, 2000, Ace Construction filed a Notice of Mechanic's Lien with the Tippecanoe County Recorder's Office against PRF as owner of the real estate

and against Optolynx in the amount of $371, 543.75. On August 10, 2001, Ace Construction filed its Complaint to Fore-close the Mechanic's Lien. On October 19, 2001, PRF filed its Answer to Complaint to Foreclose Mechanic's Lien, Counterclaim of Purdue Research Foundation and Motion for Leave to Assert Crossclaim. On October 25, 2001, the trial court granted PRF's Motion for Leave to Assert Cross-claim. On December 6, 2001, Cho d/b/a Ace Construction filed its Answer to Coun-terclaim of Purdue Research Foundation.

On December 11, 2002, Ace Construction filed its Motion for Summary Judgment, Designation of Evidence, and Supporting Brief. On December 12, 2002, PRF filed its Motion for Summary Judgment and Memorandum in Support of PRF's Motion for Summary Judgment. On May 8, 2003, the trial court entered its order granting PRF's Motion for Summary Judgment.

Ace Construction now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a decision upon a summary judgment motion, we apply the same standard as the trial court. *Miller v. NBD Bank, N.A.*, 701 N.E.2d 282, 285 (Ind.Ct.App.1998). We do not reweigh the evidence designated by the parties. *Turley v. Hyten*, 751 N.E.2d 249, 251 (Ind.Ct. App.2001). Instead, we liberally construe the evidence in the light most favorable to the non-moving party. *Schoknecht v. Ha-semeier*, 735 N.E.2d 299, 301 (Ind.Ct.App. 2000).

The moving party bears the burden of showing prima facie that there are no gen-

uine issues of material fact and that it is entitled to judgment as a matter of law. *Id.* Once this burden has been met, the non-moving party must respond by setting forth specific facts demonstrating a genu-ine need for trial, and cannot rest upon the allegations or denials in the pleadings. *Id.* We review only the designated evidentiary material in the record, construing that evi-dence liberally in favor of the non-moving party, so as not to deny that party its day in court. *Id.*

### II. *PRF's Active Consent*

■ First, Cho argues that the trial court erred in finding that PRF did not actively consent to the construction project performed by Ace Construction for the improvement of the real estate owned by PRF. Specifically, Cho asserts that PRF was actively involved in the design and construction of the clean room. As a re-sult, Cho contends that the trial court erred in concluding that Ace Construction does not have a valid mechanic's lien against PRF due to lack of active consent.

Conversely, PRF contends that they were not actively involved in Cho's design of the proposed clean room for Optolynx. Rather, PRF asserts that Optolynx deter-mined to build the clean room in the Tech-nology Center. PRF maintains that they did not have a role in selecting Ace Con-struction to manage the design or con-struction of the clean room and that they were not involved in negotiating the con-tract agreement between Ace Construction and Optolynx. Consequently, PRF argues that the trial court correctly determined that Ace's mechanic's lien was invalid be-cause PRF did not actively consent to the work performed by Ace Construction.

■ Mechanic's liens were unknown at common law and are purely creatures of statute. *Stern & Son, Inc. v. Gary Joint Venture*, 530 N.E.2d 306, 307 (Ind.Ct.App.

1988). As a consequence, mechanic's liens can only exist when the claimant has complied with the applicable statutory steps. *Id.* The courts generally have followed a strict construction in terms of adherence to the requirements for creating a lien, and a rule of liberal application of the remedial aspects of the mechanic's lien statutes. *Id.; Mid America Homes, Inc. v. Horn,* 272 Ind. 171, 396 N.E.2d 879, 881 (Ind. 1979).

Indiana's mechanic's lien statute is found at Indiana Code section 32–28–3–1. Before a mechanic's lien can attach to real estate, the statute's absolute first requirement is that the landowner consented to the improvements on which the lien is based. *Stern & Son, Inc.,* 530 N.E.2d at 307. This consent must be more than inactive or passive consent and the lien claimant's burden to prove active consent is especially important when the improvements are requested by someone other than the landowner. *Id.* This emphasis is due to the fact that without the landowner's active consent, a lien claimant can only maintain a lien to the extent of his customer's interest in the land. *Id.* Additionally, it has long been the rule that a person about to improve real estate must take notice of the extent of his customer's rights in the land and of the rights of those in possession. *Id.*

In the present case, Cho argues that PRF actively consented to Ace Construction's actions based on three facts: 1) the lease between PRF and Optolynx called for improvements made; 2) PRF was actively involved in the clean room design and construction project; and 3) PRF insisted on approving and reviewing the design plans for the clean room.

Indiana case law makes clear that a lease calling for improvements, even very detailed improvements, will not prove the sort of active consent needed to maintain a mechanic's lien. *Id.; Gardner v. Sullivan Mfg. Co.,* 77 Ind.App. 60, 133 N.E. 31, 33–4 (1921). In this case, PRF's employee, Deason, acknowledges that he reviewed the plans for the clean room. He focused solely on the technical matters, and how the construction would impact the other tenants in the Technology Center. However, the record clearly shows that Deason continuously informed Ace Construction that PRF's approval was mandatory and necessary. In fact, PRF's approval was required before any construction could begin. Further, the record discloses that PRF never gave its approval for construction of the clean room to Ace Construction. Most importantly, PRF and Optolynx never executed any type of lease agreement covering the real estate where the clean room would be built.

In any event, while these facts certainly establish that PRF was aware of the construction, this awareness nevertheless does not establish the sort of active consent needed to maintain a mechanic's lien. *Id.; see also Woods v. Deckelbaum et al.,* 244 Ind. 260, 266–67, 191 N.E.2d 101, 103–04 (Ind.1963). Here, PRF was not involved in the negotiating of the contract agreement between Ace Construction and Optolynx relating to the management of the design and construction of the clean room. The record also indicates that it was Optolynx, not PRF, who contracted to build a clean room in the Technology Center.

The exact nature and content of the owner's active consent in this context will vary from case to case. *See Stern & Son, Inc.,* 530 N.E.2d at 309. However, case law makes clear that the focus is not solely on the degree of the owner's active participation in the decisions and the actual construction. *Id.* Instead, the focus is also on how closely the improvements in question resemble a directly bargained-for benefit. *Id.* Here, PRF did not receive a direct

benefit from the improvements constructed by Ace Construction, namely, the minor demolition work of which it approved. Rather, the record reveals that PRF incurred an additional expense of nearly $10,000 to replace the ceiling in the additional space, which Ace Construction had removed. As a result, we find that there was no bargaining between PRF and Ace Construction, not to mention a bargained for benefit. *Id.*

Accordingly, we conclude that there is no genuine issue of material fact on this issue. *See* T.R. 56(C). Consequently, we find that the trial court did not err in finding that PRF did not actively consent to the construction work performed by Ace Construction. *See Stern & Son. Inc.*, 530 N.E.2d at 307. As a result, we find that the trial court did not err in granting PRF's Motion for Summary Judgment on this issue.

### III. *Mechanic's Lien*

Next, Cho alleges that the trial court erred in determining as a matter of law that the work performed by ACE Construction does not support a mechanic's lien. In particular, Cho argues that the trial court erred in finding that the work Ace Construction performed was management or supervisory services and therefore did not support the filing of a mechanic's lien. Cho also alleges that the trial court erred in determining that the equipment and materials procured by Ace Construction do not support a mechanic's lien. Additionally, Cho asserts that the trial court erred in determining that because the employees of Ace Construction are not registered engineers in the State of Indiana, they were not entitled to the protections provided under the statute.

#### A. *Ace Construction's Construction Management Services*

First, Cho alleges that the trial court erred in determining that the work performed by Ace Construction consisted of project management services and, therefore, was non-lienable. As mentioned above, a mechanic's lien was a remedy unknown at common law and is purely a statutory creation. *Stern & Son, Inc.*, 530 N.E.2d at 307; *Murdock Const. Management, Inc. v. Eastern Star Missionary Baptist Church, Inc.*, 766 N.E.2d 759, 762 (Ind.Ct.App.2002). Because the mechanic's lien is purely a creature of statute, the burden is on the party asserting the lien to bring itself clearly within the strictures of the statute. *Murdock Const. Management, Inc.*, 766 N.E.2d at 762. The legislature expressly sets forth those persons entitled to a mechanic's lien. *Id.*

Specifically, Indiana Code section 32–28–3–1, states, in pertinent part:

> Sec. 1. (a) A contractor, a subcontractor, a mechanic, a lessor leasing construction and other equipment and tools, whether or not an operator is also provided by the lessor, a journeyman, a laborer, or any other person performing labor or furnishing materials or machinery, including the leasing of equipment or tools, for:
>
> (1) the erection, alteration, repair, or removal of:
>
> (A) a house, mill, manufactory or other building;
>
> \* \* \*
>
> may have a lien as set forth in this section.

Furthermore, Ind.Code § 32–28–11–1 was enacted following *Beeson v. Overpeck*, 112 Ind.App. 195, 44 N.E.2d 195 (1942), to codify the expansion of those persons entitled to the mechanic's lien to include registered professional engineers, registered land surveyors, and registered architects. *See Murdock Const. Management, Inc.*, 766 N.E.2d at 762. The list in these two

statutes is exclusive, *i.e.*, unless Ace Construction falls within one or more of these listed categories, it is not entitled to the benefits of the mechanic's lien statute. *Id.* Thus, Cho must show that under a proper construction of the mechanic's lien statute, a construction manager acting as it did in this case may acquire a mechanic's lien. *See id.*

Cho argues that Ace Construction qualifies as a "laborer" or "persons performing labor or furnishing materials" as those terms and that phrase are used in the mechanic's lien statute. PRF counters that Ace Construction provided only supervisory or management services, and thus, is not entitled to the benefits of the statute.

In determining whether Ace Construction's services are the type of "labor or materials" that are lienable under the mechanic's lien statute, we conclude that the supreme court opinion, *Premier Investments v. Suites of America, Inc.*, 644 N.E.2d 124 (Ind.1994), addressing the issue of mechanic's liens where supervisory services are involved, is of controlling authority. In *Premier*, the developer, Premier Investments, entered into a contract with Howard Johnson Franchise Systems, Inc. (Howard Johnson) under which Premier Investments agreed to develop certain real estate into a hotel. The contract required Premier Investments to "develop plans, specifications and construction budgets, and otherwise be responsible for the construction, equipping, staffing, and opening of the hotel." *Id.* at 125–26. Specifically, Premier Investments obtained the necessary zoning and building approvals, bid the project and hired the general contractor, monitored the construction on a day-to-day basis, made sure that the owner was not paying for any materials that were not on site and that the materials on site were to be used in the construction of the hotel. *Id.* Furthermore, Premier Investments coordinated with the architects, recommended and authorized design and construction changes. *Id.* at 126. The agreement was a classic turn-key arrangement where developer, using financing provided by the owner, would deliver to the owner a completed hotel ready to turn the key and begin business. *Id.*

Soon after ownership of the property was conveyed from Howard Johnson to Fairfield Development IV, Inc. (Fairfield), Fairfield ceased construction. Premier Investments then filed a Sworn Statement and Notice of Intention to Hold Mechanic's Lien. *Id.* Subsequently, ownership was conveyed to Suites of America, Inc., pursuant to an order by the Bankruptcy Court. At trial, Suites of America, Inc., filed a Motion for Partial Summary Judgment contending that Premier Investments did not have a valid mechanic's lien. This court reversed the trial court's grant of partial summary judgment in favor of Suites of America, Inc., determining that Premier Investments' mechanic's lien was void as a matter of law. The supreme court granted transfer. The decision of the court of appeals was vacated, and the supreme court affirmed the trial court's grant of partial summary judgment in favor of Suites of America, Inc. The court concluded that in narrowly construing the statute, Premier Investments was not included in the categories of persons entitled to a mechanic's lien, as purely supervisory services do not constitute labor under the mechanic's lien statute. *Id.*

According to the instant record, Ace Construction performed on-site supervision and coordination of the work, arranged for delivery and storage, protection and security for the materials, systems, and equipment used for the clean room, as well as site clean-up. The record reveals that Ace Construction also used its con-

struction skill and expertise in developing plans and specifications used in the construction and supervision of the construction. We fail to see any meaningful distinction between the purely supervisory duties performed by Ace Construction and those performed by the developer in *Premier*.

Nonetheless, Cho argues that since Ace Construction completed the minor demolition work, as approved by PRF, they performed more than supervisory and management services. However, as discussed above, PRF approved the demolition work because it was minor in scope and nature and in the long run PRF incurred an additional expense because of the work. Moreover, the contract agreement between Optolynx and Ace Construction explicitly provided that Ace Construction would "professionally manage" the project and, further, Ace Construction would procure required subcontracting services, and an experienced technical crew to perform the turnkey installation. Therefore, consistent with the supreme court's holding in *Premier*, we conclude that Ace Construction is not a "laborer" within the meaning of the mechanic's lien statute. *See Premier*, 644 N.E.2d at 129–30.

Accordingly, in narrowly construing the mechanic's lien statute, we conclude that Ace Construction's claim seeks compensation for supervisory services that are not covered under the statute. *See Murdock Const. Management, Inc.*, 766 N.E.2d at 765. Consequently, we find that the trial court did not err in concluding that Ace Construction's services were management services and therefore do not support a mechanic's lien.

B. *Equipment and Materials Procured by Ace Construction*

■ Next, Cho asserts that the trial court erred in determining that the materials ordered, but not delivered or installed on PRF's property, cannot be a component of Ace's Mechanic's lien. In particular, Cho contends that Ace Construction purchased custom equipment and materials for the clean room that could not be returned to the vendor; as a result, Ace Construction claims that they should be entitled to a mechanic's lien. On the contrary, PRF maintains that the equipment and materials procured by Ace Construction, but not installed, do not support a mechanic's lien.

■ The statutory and common law requirements as to 'such materials' which must be furnished are that: (1) the materials must be sold to the property owner or his agent for that purpose; (2) the materials must be furnished for the purpose of being used in constructing the particular improvement; (3) the improvement must have been authorized by or consented to by the property owner; and (4) the materials must have actually been used in the construction. *Stanray Corp. v. Horizon Const., Inc.*, 168 Ind.App. 164, 342 N.E.2d 645 (1976). As to when such materials are furnished, we mean simply that they have been ordered for and delivered to such person. *Id.*

In the instant case, the record shows that the equipment and materials that Ace Construction purchased for the construction of the clean room were never delivered nor installed in the Technology Center. The record reveals that PRF never took possession of the materials and equipment. Furthermore, the record is devoid of evidence that PRF specifically requested Ace Construction to purchase any of the equipment or materials for the Technology Center.

Moreover, as we have determined above, PRF did not give Ace Construction its approval to begin the construction work. The record clearly shows that PRF contin-

uously informed Ace Construction that PRF's approval of the design was required before Ace Construction could begin building the clean room. However, due to PRF's concerns about the design plan that were conveyed to Ace Construction and most importantly, due to the fact that Optolynx and PRF could not reach an agreement on the lease for the clean room space, Ace Construction did not have the authority to begin purchasing materials to construct the clean room.

Indiana law places a burden upon a mechanic's lienholder who seeks to foreclose such a lien to show that the purported lien meets all statutory requirements necessary to its creation. *Gooch v. Hiatt,* 166 Ind.App. 521, 337 N.E.2d 585, 587 (1975). In light of the above, we find that Cho has not satisfied these requirements. *See id.; see also Stanray Corp.,* 342 N.E.2d at 653. Consequently, we hold that the trial court did not err in finding that Ace Construction cannot maintain a mechanic's lien for the value of the materials and equipment purchased but not installed or delivered to PRF.

## C. *Professional Engineering Services*

Cho also contends that the trial court erred in determining that Ace Construction cannot maintain a mechanic's lien against PRF for the professional engineering services rendered to Optolynx. In response, PRF claims that the trial court correctly determined that the lien rights available under Ind.Code § 32–28–11–1 are not available to Ace Construction since they are not registered or licensed engineers in the State of Indiana.

Indiana Code section 32–28–11–1, provides:

Registered professional engineers, registered land surveyors, and registered architects may secure and enforce the same lien that is now given to contrac-

tors, subcontractors, mechanics, journeymen, laborers, and materialmen under IC 32–28–3 and any statues that supplement IC 32–28–3.

Although Cho acknowledges that the employees of Ace Construction are not registered engineers in the State of Indiana he, nevertheless, maintains that since the employees are registered in the State of California, the statute is extended to them.

We disagree with Cho. As previously mentioned, because the mechanic's lien is purely a creature of statute, the burden is on the party asserting the lien to bring itself clearly within the strictures of the statute. *See Murdock Const. Management, Inc.,* 766 N.E.2d at 762. Ind.Code § 254–31–1–21 provides for engineers registered in other states to become registered in Indiana only upon application to, and approval of, the State Board of Registration for Professional Engineers. *See* Ind.Code § 25–31–1–21. Thus, upon doing business in the State of Indiana, Ace Construction was required to register and comply with the requirements as set forth in Ind.Code § 25–31–1–21, to be afforded the protections under the statutes. However, the record is devoid of evidence that Ace Construction completed these requirements.

Therefore, we find that the term "registered engineer" as used in Ind. Code § 32–28–11–1 is limited to engineers registered to practice in Indiana by the State Board of Registration for Professional Engineers. *See* I.C. § 25–31–1–21. We further conclude that the statute must be narrowly construed in determining those persons entitled to its protection. *See Premier Investments,* 644 N.E.2d at 130. If the legislature intending developers, in the same position as Ace Construction, to be entitled to a mechanic's lien for their

services, it must expressly so provide. *See id.*

### IV. *Untimely Filed Mechanic's Lien*

▪ Further, Cho argues that the trial court erred in finding that Ace Construction's mechanic's lien was not filed in a timely manner. In particular, Cho maintains that Ace Construction provided labor and materials for the clean room within the 90–day period prior to filing its notice of mechanic's lien. Consequently, Cho contends that the filing of the mechanic's line was timely.

Indiana Code section 32–28–3–3, provides, in pertinent part:

(a) Except as provided in subsection b, a person who wishes to acquire a lien upon any property, whether the claim is due or not, must file in duplicate a sworn statement and notice of the person's intention to hold a lien upon the property for the amount of the claim:

    (1) in the recorder's office of the county; and

    (2) not later than ninety (90) days after performing labor or furnishing materials or machinery described in section 1 of this chapter.

Here, the record shows that Ace Construction completed the minor demolition work of the ceiling and grid that PRF approved of on May 18, 2000. However, the record discloses that Ace Construction did not file its mechanic's lien until September 17, 2000. Thus, the filing of Ace Construction's mechanic's lien was after the 90–day time period as required by Indiana Code section 32–28–3–3.

Nonetheless, Cho argues that Ace Construction provided labor and materials for the clean room up to and beyond Optolynx's contract termination notice of September 7, 2000. As a result, Cho claims to have timely filed its mechanic's lien. We find that Cho's argument without merit. Particularly, as this court previously determined, Cho was not entitled to a mechanic's lien on the work performed or materials purchased due to lack of approval by PRF. Accordingly, we find that the trial court correctly determined that Ace Construction's mechanic's lien was invalid because it was not timely filed.

### V. *Expenses Incurred*

▪ Lastly, Cho argues that the trial court erred in determining that Ace Construction cannot maintain a mechanic's lien for the costs and expenses incurred in connection with building the clean room. However, Cho is merely restating his previous arguments for our review. As determined above, Ace Construction is not entitled to recoup these expenses because: 1) Ace Construction's services are classified as "management" not "labor" services and 2) PRF did not get a directly bargained-for benefit from the work performed by Ace Construction; rather, PRF incurred an additional cost from the work that Ace Construction performed. *See Premier Inv.,* 644 N.E.2d at 126; *see Stern & Son, Inc.,* 530 N.E.2d at 309. Furthermore, because we previously held that Ace Construction cannot maintain a mechanic's lien for the materials and equipment purchased without the consent of PRF, we also find that Ace Construction is not entitled to a mechanic's lien for the costs and expenses they incurred in connection with the unauthorized purchase of these items.

Accordingly, we find that there is no genuine issue of material fact appropriate for trial regarding Ace Construction's mechanic's lien for the expenses they incurred. *See* T.R. 56(C). Consequently, we find that the trial court did not err in granting summary judgment in favor of PRF on this issue.

**1174**

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly denied Cho's Motion for Summary Judgment. Therefore, we affirm the trial court's grant of summary judgment in favor of PRF.

Affirmed.

SULLIVAN, J., and FRIEDLANDER, J., concur.